COURT OF APPEALS OF VIRGINIA

Present:    Chief Judge Decker, Judges AtLee and Bernhard
Argued at Lexington, Virginia

DARLENE S. SMITH, ET AL.

OPINION BY
v.        Record No. 0850-24-3        JUDGE RICHARD Y. ATLEE, JR.
AUGUST 19, 2025

ALLEN CREEK ASSOCIATES, LLC

FROM THE CIRCUIT COURT OF NELSON COUNTY
Michael R. Doucette, Judge

Maynard L. Sipe (Boyd & Sipe PLC, on brief), for appellants.

Stephen K. Strosnider (Franklin, Denney, Ward & Strosnider PLC,
on brief), for appellee.

This case involves Allen Creek Associates, LLC's ("ACA") petition to relocate two

easements under Code § 55.1-304, which the circuit court granted.  Darlene Smith, William

Smith, and Maxine Small (collectively "appellants") appeal the circuit court's ruling.  Appellants

raise three issues on appeal.  First, they argue that there was no justiciable controversy ripe for

adjudication.  Second, they argue that the relocation amounted to an unconstitutional taking of

private property for the benefit of a private party.  Finally, appellants argue that the circuit court

"misinterpreted and misapplied" Code § 55.1-304.  For the following reasons, we disagree and

affirm the decision of the circuit court.

I. BACKGROUND

A. *The Properties*

ACA owns a parcel of land consisting of 19.35 acres located just off Route 151 in Nelson

County, Virginia.  ACA planned to develop the property and build a residential community.  As

part of its plans, ACA sought to relocate two easements that run across the property: the Allen

Creek Right of Way ("Allen Creek ROW") and the Eastern Right of Way ("Eastern ROW"). These easements serve the properties of Darlene and William Smith and Maxine Small.[1]

Darlene and William Smith own 10.2 acres north of ACA's property. The Smiths live on their property. Maxine Small owns a separate 10.2-acre parcel of land also north of ACA's property. She does not live on her property. Both the Smiths and Small use their property for agricultural purposes, currently growing hay. The easements running across ACA's property give appellants access to their properties from Route 151.

B. *The Easements*

The Allen Creek ROW runs from Route 151 along the southern and western edge of ACA's property, and it generally follows along Allen Creek. It varies in width, ranging from 18 to 30 feet wide. Though originally 30 feet wide at its narrowest point, due to erosion the narrowest point is currently 18 feet wide. Within the easement, there is a paved surface about nine feet wide. The distance from the edge of the paved surface to the bank of Allen Creek is generally between two and three feet, though the distance is approximately one foot at the narrowest point. Both the Smiths and Small use the Allen Creek ROW as the primary access point to their properties.

The Eastern ROW starts at Route 151 and runs along the eastern edge of ACA's property. The deed describes the Eastern ROW as "a right-of-way 25 feet in width running along and near the eastern boundary of the subject property." There are no roadways or other improvements within the easement. Some parts of the Eastern ROW contain trees, and it meets the Small property at a heavily wooded area with a steep hill.

---

[1] Pacific Group Resorts, Inc., also owns property served by the easements, and it too was served with the petition to relocate the easements. Pacific Group, however, did not object to the relocation of the easements, and it is therefore not a part of this appeal.

The following image depicts ACA's property and both the Allen Creek ROW and the Eastern ROW.



C. *The Petition to Relocate the Easements*

ACA spent a year trying to reach an agreement with appellants to relocate the easements. When those efforts were unsuccessful, ACA filed a petition to relocate the easements under Code § 55.1-304. Under the statute, the circuit court "shall" grant the petition if, after a hearing, the court finds that "the relocation will not result in economic damage to the parties in interest," "there will be no undue hardship created by the relocation," and the easement has existed for "not less than 10 years." Code § 55.1-304.

At the hearing, ACA submitted a site plan showing the proposed location for the easements. Under ACA's plan, the relocated easements would align with the roadways that would serve the residential development. The proposed easements would run from Route 151 through to a cul-de-sac near Small's property where the road would join the current driveway within the Allen Creek ROW accessing appellants' properties. Appellants could take either of two routes from Route 151 to the cul-de-sac, one that turns and runs parallel to Allen Creek or

one that continues straight before curving back towards the cul-de-sac.[2] The site plan showed a minimum width of 40 feet for the proposed easements, containing a paved surface at least 18 feet wide with 4-foot shoulders. The site plan is included below for reference:



To support its petition, ACA presented testimony from Timothy Hess, ACA's managing member, who explained that ACA attempted to work with appellants to relocate the easements, but that its efforts were unsuccessful. Hess testified that ACA sought information about the agricultural equipment appellants used to farm their land and what the equipment required, but appellants did not respond. Even so, ACA's engineer designed the plan to accommodate large agricultural equipment.

Hess acknowledged that ACA's initial petition included a different site plan that would have largely left the Allen Creek ROW in place, shifting only a portion of the easement. He explained that the initial site plan was changed for two reasons. First, the Virginia Department of Transportation ("VDOT") wanted the entrance moved because it "deemed that entering from the existing driveway would not be a safe entrance" and did not want two entrances merging.

---

[2] The latter route also has a 25-foot right of way branching off to the east and connecting to the eastern end of Small's property, replacing the Eastern ROW.

Second, because of the Chesapeake Bay Act, the Department of Environmental Quality ("DEQ") would not permit a roadway that close to Allen Creek.

Both Hess and Stephen Driver, the civil engineer who designed the site plan, testified that neither Nelson County nor VDOT would approve ACA's site plan while the current easement entrance onto Route 151 existed. Driver explained that Nelson County would not approve the site plan until VDOT signed off, and VDOT, for safety reasons, would not grant site approval without a "shared entrance agreement." But Driver testified that once they had the shared entrance agreement, VDOT told them they would be "good to go."

Driver then asserted that the proposed easements and roadways were superior to the existing ones and would be "sufficient for ingress and egress of agricultural equipment to the Smith and Small parcels." Driver explained that the standard turn radius for a residential subdivision is 25 feet but that he designed the roads to include turn radii sufficient for large agricultural equipment; he testified that the first turn included a 50-foot turn radius and the second turn included a 100-foot turn radius. A vehicle 12 feet wide could navigate the proposed roadways. Further, the grades of the proposed roads would be safe for both personal and farm vehicles.

Driver also testified that the existing easements were insufficient "for an intensive development or subdivision of the Smith property or the Small property," and he explained that the current easement was not wide enough to construct a street of the width required to develop property under the Nelson County code. Driver testified that the existing roadway within the Allen Creek ROW was "unsafe because there is one location along that driveway where the distance between the edge of the existing paved surface and the top of the bank on Allen Creek is 1 foot" and there are other locations where the distance is only 2-3 feet. These distances do not

meet road safety standards and "the bank along Allen Creek is very steep, drops off abruptly, and, for the majority of its length, is a distance of 4 to 6 feet."

Following ACA's evidence, appellants called their own witnesses. Among them, they called Michael Raynes, the man who cuts the hay on appellants' property. That process requires him to "fertilize the fields, and then . . . travel in and out with the tractors, the cutters, the rakes, the balers, [and] trailers to haul the hay out." The widest piece of equipment he uses is 12 feet wide. Typically, he takes his equipment to and from appellants' properties twice in the spring and twice in the fall. He typically does not use the Eastern ROW to access the properties because of the steep hill and the trees. When Raynes leaves the Allen Creek ROW on to Route 151, his ultimate destination is to the right. He testified, however, that with the current driveway, he cannot safely make that right turn and instead must turn left, drive up the road to a parking lot, turn around, and come back out.

Donna Small also testified for appellants. She is Maxine Small's daughter and has her mother's power of attorney to deal with the Small property. Darlene Smith is her sister. Donna testified that they use the properties for agricultural purposes, which involved growing hay to feed their cattle. According to Donna, appellants objected to the relocation of the easements because they were concerned about their ability to continue farming activities on the land. They had also considered other uses for their property, such as a corn maze or a brewery. She acknowledged that appellants did not have any "fixed plan," explaining that they just wanted to maintain the right and ability to do "farming activit[ies]." She also confirmed that the Small property did not have water service to it. And on cross-examination, she agreed that her mother would be in the same position if the easement was relocated so long as it was 25 feet the entire length.

Finally, appellants called Massie Sanders, a land surveyor and civil engineer, to testify about the road designs. He opined that a truck and trailer used to haul hay could not safely turn in a 50-foot turn radius, such as the one on the site plan, without running onto the grass or shoulder. He would not suggest what turning radius would be sufficient; he only looked at what was set out in the plan. In his opinion, the width of the proposed roads would be sufficient if used exclusively for farm equipment, but it would not be safe if used for residential purposes also.

Appellants argued that an order relocating the easement would be an improper advisory opinion because ACA had not yet received any governmental approvals or permits, and obtaining those approvals could require changes to the site plan. Thus, they argued that the issue was based on speculative facts rather than an actual controversy. Appellants also argued that the relocation of the easements would cause both economic damage and undue harm. They contended that the alleged road improvements would not be safer for the agricultural equipment because of the additional residential traffic, which could render the road "impassable" for the agricultural equipment. They argued that the equipment would be required to go into the shoulders to make turns on the proposed roads and that the plan would decrease the number of trips per day that they were permitted. Finally, appellants argued that an order relocating the easements would constitute an unconstitutional taking for private purposes.

ACA argued that the evidence established that it could not proceed further without relocation of the easements and that the plan would be approved once a shared entrance agreement was submitted. Thus, ACA argued that the matter was ripe for adjudication, analogizing to a court's authority to issue a declaratory judgment. It also argued that the relocation would not cause economic damage or undue hardship, noting that the relocated easements had been designed for agricultural equipment and would be safe for such equipment.

- 7 -

It added that the proposed roads were safer than the current roadway used by appellants, and the roads would be maintained at no cost to appellants, which would economically benefit them. ACA also argued that the relocation would not prevent future permitted uses of the property.

The circuit court issued a letter opinion finding in ACA's favor. The circuit court first concluded that it had jurisdiction to decide the issue. Relying on its declaratory judgment authority, the circuit court noted that the controversy rose "above the level of speculation" and would "likely occur if things [we]re left to their normal course." Relying on dictionary definitions of "economic damage" and "undue harm," the circuit court concluded that relocating the easements would not cause either economic damage or undue harm.[3] Based on that conclusion, it also found that relocating the easements would not constitute a taking and would leave appellants with all the same benefits they enjoyed before the relocation. Thus, it ordered relocation of the easements.[4] Appellants now appeal.

## II. ANALYSIS

A. *ACA established that there was a justiciable controversy.*

Appellants argue that there was no justiciable controversy ripe for adjudication and the circuit court therefore erred by "rendering a judgment that significantly altered appellants' property rights." They contend that the petition was based only on future or speculative facts

---

[3] The circuit court found that the issues revolved around the safety of the roads for the agricultural equipment, the turn radii, the incline grades on the roadway, and whether the relocated easements would impair future economic development potential.

[4] As part of its order, however, the court stated that appellants could continue using the current easements until the roadways in the relocated easements were completed.

rather than present facts. We disagree and find that ACA established that the issue was ripe for adjudication.

Whether a justiciable controversy exists is a question of law that we review de novo on appeal. *See Platt v. Griffith*, 299 Va. 690, 692 (2021) (reviewing the question of standing, a justiciability question, de novo).

"[A]n actual controversy is a prerequisite to a court having authority." *Martin v. Garner*, 286 Va. 76, 82 (2013) (alteration in original) (quoting *Charlottesville Area Fitness Club Operators Ass'n v. Albermarle Cnty.*, 285 Va. 87, 98 (2013)). This prerequisite can be "referred to as the requirement of a 'justiciable controversy.'" *Id.* (quoting *Fitness Club Operators*, 285 Va. at 98). Without an actual controversy, any opinion rendered by the court is advisory, which the court lacks jurisdiction to render. *Id.*

"A justiciable controversy 'involves an actual adjudication of rights' resolving 'specific adverse claims, based upon present, rather than future or speculative facts.'" *Highlander v. Va. Dep't of Wildlife Res.*, 84 Va. App. 404, 427 (2025) (quoting *Daniels v. Mobley*, 285 Va. 402, 408 (2013)); *see also Berry v. Bd. of Supervisors*, 302 Va. 114, 131 (2023) (defining "justiciable controversy" as "an actual controversy between the parties that is not based solely on speculation or purely hypothetical scenarios that may (or may not) occur at some undefined point in the future"). "For a justiciable controversy to exist, it must be possible for the circuit court to render a decree yielding specific relief, such that the plaintiff's rights will be thereby affected." *Highlander*, 84 Va. App. at 408 (quoting *Daniels*, 285 Va. at 408).

Here, ACA has established the existence of a justiciable controversy. Code § 55.1-304 is a statutory cause of action. The statute permits relocation of the easement by written agreement of the parties. In the absence of such an agreement, the statute expressly permits the servient landowner to petition the circuit court to relocate the easement. That is exactly what ACA did.

ACA spent nearly a year trying to negotiate an agreement with appellants. When that did not pan out, ACA petitioned the circuit court to relocate the easement. Nothing in the statute requires any governmental approvals or other prerequisite prior to petitioning the circuit court for relocation.

Beyond the lack of statutory requirements, the evidence established that the controversy involved present facts rather than future or speculative facts. ACA presented evidence that it attempted to develop a site plan leaving the easements largely in their original positions, but that VDOT, DEQ, and Nelson County would not approve the plan because of the existing entrance from the Allen Creek easement onto Route 151. Though ACA had not yet submitted a plan to Nelson County, it established that Nelson County would not grant the necessary approvals "without site plan approval from VDOT." VDOT would not approve a plan with multiple entrances onto Route 151, and for ACA to obtain VDOT's approval, it needed to submit a shared entrance agreement. ACA tried, unsuccessfully, to negotiate a shared entrance agreement with appellants for approximately a year.

Further, ACA developed its current plan in consultation with DEQ, VDOT, and Nelson County to comply with all governmental regulations, and it presented evidence that VDOT would approve the site plan once there was a shared entrance agreement or court order relocating the easement. Based on ACA's evidence, the only thing stopping ACA from proceeding was appellants' refusal to enter a shared entry agreement. ACA's only alternative was to proceed with the petition to relocate the easement. Thus, ACA has established that there were actual adverse claims based on present, rather than future or speculative facts. Accordingly, we find that the circuit court did not err in concluding that there was a justiciable controversy.

B.  *The circuit court properly applied Code § 55.1-304.*

Appellants argue that the circuit court "misinterpreted and misapplied" Code § 55.1-304 and that it erred when it found that relocating the easement "would not result in loss or injury to any real or potential economic benefits and would not cause excessive or unwarranted hardship or adversity."[5]

Issues related to statutory interpretation are reviewed de novo.  *Va. Elec. & Power Co. v. State Corp. Comm'n*, 300 Va. 153, 161 (2021).  "We are bound by the trial court's factual findings unless those findings are plainly wrong or unsupported by the evidence."  *Malbrough v. Commonwealth*, 275 Va. 163, 168 (2008).  But we "review the [circuit] court's application of the law to facts de novo."  *Heald v. Rappahannock Elec. Coop.*, 80 Va. App. 53, 74 (2024) (quoting *Commonwealth ex rel. Fair Hous. Bd. v. Windsor Plaza Condo. Ass'n*, 289 Va. 34, 59 (2014)).

When interpreting a statute "our primary objective is 'to ascertain and give effect to legislative intent,' as expressed by the language used in the statute."  *Geico Advantage Ins. Co. v. Miles*, 301 Va. 448, 455 (2022) (quoting *Cuccinelli v. Rector & Visitors of the Univ. of Va.*, 283 Va. 420, 425 (2012)).  "[W]e determine the General Assembly's intent from the words contained in the statute."  *Id.* (alteration in original) (quoting *Williams v. Commonwealth*, 265 Va. 268, 271 (2003)).  "Consequently, we 'apply[] the plain meaning of the words unless they are ambiguous

---

[5] On appeal, appellants argue that the trial court misinterpreted Code § 55.1-304.  In the court below, however, they argued only that the trial court misapplied Code § 55.1-304.  "No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice."  Rule 5A:18.  Thus, on appeal, we consider only whether the circuit court properly applied Code § 55.1-304, and we interpret Code § 55.1-304 only to the extent necessary to make that determination.

Appellants also argue that the circuit court erred by "reform[ing]" the easement, which it contends is not permitted under the statute.  But the circuit court did not "reform" the easement, as the order specifically stated that appellants "enjoy the same rights" under the relocated easements as they did under the original easement.

or [doing so] would lead to an absurd result.'" *Eley v. Commonwealth*, 70 Va. App. 158, 164 (2019) (alterations in original) (quoting *Wright v. Commonwealth*, 278 Va. 754, 759 (2009)).

Code § 55.1-304 provides an avenue for relocating an easement, either by written agreement or, absent a written agreement, "upon petition to the circuit court and notice to all parties in interest." Relevant here, such a petition

> shall be granted if, after a hearing held, the court finds that (i) the relocation will not result in economic damage to the parties in interest, (ii) there will be no undue hardship created by the relocation, and (iii) the easement has been in existence for not less than 10 years.

Code § 55.1-304. There is no dispute that the easements at issue have existed for more than ten years. Appellants challenge only whether the relocation of the easements will result in "economic damage" and "undue hardship." Those terms are not defined in the statute or any relevant provisions.

"Where a 'statute's terms are undefined' by the legislature, we give those terms 'their "ordinary meaning," in light of "the context in which [they are] used."'" *Eley*, 70 Va. App. at 165 (quoting *Va. Marine Res. Comm'n v. Chincoteague Inn*, 287 Va. 371, 384 (2014)). "In ascertaining such meaning, dictionary definitions and pertinent analysis in prior case law may be consulted." *Id.*; *see also Jones v. Commonwealth*, 296 Va. 412, 415 (2018) (relying on a standard dictionary definition); *Joseph v. Commonwealth*, 64 Va. App. 332, 338-39 (2015) (relying on multiple legal and non-legal dictionary definitions).

1. Economic Damage[6]

Code § 55.1-304 does not define "economic damage."  Generally, "damage" is defined as "loss or injury to person or property."  *Damage*, *Black's Law Dictionary* (12th ed. 2024); *see also Damage*, *Webster's Third New International Dictionary* (2002) (defining damage as "injury or harm to person, property or reputation").  Thus, to prevail under this prong of Code § 55.1-304, ACA had to prove that relocating the easement would not cause appellants economic loss or injury.

Here, the record supports the circuit court's finding that the relocation of the easements would not cause economic damage to appellants.  Appellants do not point to any evidence in the record showing that they would be unable to continue their farming operations or conduct new agricultural uses (including agrotourism) if the easements are relocated.  Nor do they present any evidence of possible cost to them.

The evidence established that appellants would be able to conduct the same agricultural activities that they are currently able to conduct.  ACA established that it designed its site plan with appellants' agricultural equipment in mind.  The roads and turn radii were designed to accommodate a piece of equipment 12-feet wide, which is the width of the widest piece of equipment used by appellants.  There was no evidence that improving the relocated easements would increase the costs for appellants, as the roadways in the relocated easements were to be built and maintained at ACA's cost, and there was no evidence that any cost to improve the relocated easements would cost appellants any more than it would have cost them to improve the existing Allen Creek ROW or the undeveloped Eastern ROW.

---

[6] Appellants argue that the circuit court "became caught up in evaluating irrelevant factors," such as the existing physical conditions compared to the new improvements.  While these factors may not apply in all cases under Code § 55.1-304, they were relevant here to determine whether relocation would cause economic damage or undue harm.  Thus, the circuit court did not err in considering these issues.

Appellants' argument that the relocation of the easement would hamper their ability to develop the property in the future is speculative. *See Shenandoah Acres v. D.M. Conner*, 256 Va. 337, 342 (1998) ("[T]he party seeking relief must show that the alleged harm is imminent, and not merely speculative or potential."). Appellants had no fixed plan on how they wanted to develop the property, listing multiple ideas (such as a brewery, corn maze, or pumpkin patch), but the only consistent evidence was that it would be a "farming activity." They presented no evidence on when they planned to develop the property, and they presented no evidence describing how any potential plans would be hampered by relocating the easement. Donna Small, the daughter of Maxine Small, even agreed that her mother would be in the same position if the easement was relocated so long as it was the same 25-foot width for the entire length of the relocated easement. And the Small property did not even have water service to it.

Further, ACA presented evidence that the current easements were insufficient for "an intensive development or subdivision" of either of appellants' properties. The current Allen Creek ROW, originally 30 feet wide, was now only 18 feet wide at the narrowest due to erosion, which would be insufficient for certain subdivision zoning requirements. Moreover, the roadway through that easement was unsafe for potential commercial use, as there was only one foot between the edge of the road and the bank of Allen Creek, and the bank was four to six feet tall. And the entrance from the Allen Creek ROW to Route 151 was a safety concern due to its proximity to the bank of Allen Creek. Thus, there was no evidence that the relocation of the easements would cause *any* economic damage to appellants. Accordingly, the circuit court did not err in so finding.

2. Undue Hardship

Likewise, Code § 55.1-304 does not define "undue hardship." In determining the meaning of hardship, we look first to the definition of "hardship," which is defined as

"[p]rivation; suffering or adversity."  *Hardship*, *Black's Law Dictionary*, *supra*; *see also Hardship*, *Webster's Third New International Dictionary*, *supra* (same).  "Undue" modifies "hardship" in the statute and is defined as "excessive or unwarranted."  *Undue*, *Black's Law Dictionary*, *supra*.  Undue hardship then means an excessive or unwarranted privation or adversity.  As the circuit court concluded, some level of hardship is permitted given that "undue" qualifies "hardship" and cannot be ignored when interpreting the statute.  *See City of Emporia v. Cnty. of Greensville*, 81 Va. App. 28, 38-39 (2024) ("[W]e disfavor a construction of statutes that renders any part of the statute useless or superfluous." (quoting *Shoemaker v. Funkhouser*, 299 Va. 471, 487 (2021))).

But we need not determine the exact level of hardship permissible under the statute,[7] as the evidence, viewed in the light most favorable to ACA, shows that the relocation of the easement would cause no undue harm, and even some benefit, to appellants.  Appellants' argument related to their use of the land for agricultural purposes and their ability to get agricultural equipment across the right of way onto their properties.  ACA presented evidence that the site plan was developed with appellants' agricultural equipment in mind.  The engineer who designed the plan testified that the new easements and roadways were "sufficient for ingress and egress of agricultural equipment" to appellants' properties.

The widest piece of equipment used by appellants is 12 feet, which is wider than the 9-foot paved surface in the current Allen Creek ROW.  The roadway in the proposed easement would be 18 feet with 4-foot shoulders.  Although the standard turn radius for residential areas is 25 feet, ACA's engineer designed the development with 50-foot and 100-foot turning radii.  Thus, by design, appellant's farm equipment should not have to encroach into the opposite lane

---

[7] *See Baum v. Lunsford*, 235 Va. 5, 8 (1988) (assuming without deciding that "undue hardship" might mean something different in different contexts, such as subdivision versus zoning).

- 15 -

of the road to complete turns. And if there were some obstructions in the road due to the residential nature of the development, such as a car parked in the street, the agricultural equipment could make use of the other lane of the road. Thus, the evidence does not establish that there would be any hardship, let alone undue hardship, to appellants.

Additionally, Michael Raynes, the farmer who drives the agricultural equipment for the appellants, testified that he often could not safely turn the agricultural equipment right on to the highway from the current easement. He testified that he would turn left, drive until he reached a parking lot where he could turn around, and then double back towards his destination. Under the proposed plan, however, the new roadway would include separate turn lanes that would allow safer and easier turns. Thus, contrary to appellants' arguments, the evidence establishes that the proposed easement locations would not cause hardship to appellants and would be safer. Accordingly, the circuit court did not err in concluding that the relocation would not cause undue harm to appellants.

C. *The evidence established that there was no taking.*

Appellants next argue that the circuit court's order relocating the easements constituted an "unconstitutional taking by the state of private property rights for the private gain and benefit of another private party."

The Virginia Constitution[8] provides that "[t]he General Assembly shall pass no law whereby private property, the right to which is fundamental, shall be damaged or taken except for public use. No private property shall be damaged or taken for public use without just

---

[8] On brief, appellants also make an argument under the federal constitution. Their argument below, however, references only the Virginia Constitution. Therefore, we will not consider their argument under the federal constitution. *See* Rule 5A:18 ("No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice.").

- 16 -

compensation to the owner thereof." Va. Const. art. I, § 11. "Whether a taking has occurred is a question of law that [appellate courts] review de novo." *Johnson v. City of Suffolk*, 299 Va. 364, 370-71 (2020).

"A threshold question in any takings case is whether the government action has affected a property interest that is cognizable under the pertinent clauses of the United States and Virginia constitutions." *Id.* at 370. "In other words, does the plaintiff have an interest that is recognized as a property interest?" *Id.* "To state a claim, the property owner must allege that a 'right connected to the property is adversely affected by governmental action.'" *Id.* (quoting *Livingston v. Va. Dep't of Transp.*, 284 Va. 140, 157 (2012)). "To take or damage property in the constitutional sense does not require that the sovereign actually invade or disturb the property. Taking or damaging property in the constitutional sense means that the governmental action adversely affects the landowner's ability to exercise a right connected to the property." *Richmeade, L.P. v. City of Richmond*, 267 Va. 598, 602 (2004).

Appellants argue that the circuit court's order relocating the easement constituted a governmental act.[9] Assuming without deciding that the circuit court's order constituted a governmental act and that the appellants had a cognizable property interest in the easement, we find that no taking occurred because the relocation did not adversely affect appellants' rights connected to the easement. *See Butcher v. Commonwealth*, 298 Va. 392, 396 (2020) ("As we have often said, 'the doctrine of judicial restraint dictates that we decide cases "on the best and narrowest grounds available."'" (quoting *Commonwealth v. White*, 293 Va. 411, 419 (2017))).

The original easement granted appellants the right of ingress and egress, and they still enjoy that right. The circuit court's order specifically stated that appellants "shall enjoy the same

---

[9] Appellants also argue that the taking occurred for a private purpose, which is prohibited under Virginia law. Because we find that no taking occurred, we need not determine the purpose of any alleged taking.

rights over and upon the relocated easements that are contained in [appellants'] chains of title, including but not limited to, the right to drive across the relocated easements fifty (50) times per day, per parcel." ACA's evidence established that appellants' agricultural equipment could still access the property through the relocated easements, which were specifically designed to accommodate the equipment. It also established that the relocated easements and roadways would be safer than the current easement and roadway. The relocated easements and roads would likely improve the development potential of appellants' property, and the relocation does not limit or inhibit appellants' use of their own property. Further, appellants are not required to build or maintain the roads in the new easements. Thus, the evidence established that a taking did not occur because appellants' rights are not adversely affected. Accordingly, the circuit court did not err.

### III. CONCLUSION

For the foregoing reasons, we hold that the circuit court did not err in relocating the easements. Therefore, we affirm the decision of the circuit court.

*Affirmed.*